*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

RAY LIVINGSTON LEE,

        Defendant-Appellant.

UNPUBLISHED
July 1, 2021

No. 350108
Genesee Circuit Court
LC No. 17-042041-FC

Before: JANSEN, P.J., and M. J. KELLY and RONAYNE KRAUSE, JJ.

PER CURIAM.

Defendant, Ray Livingston Lee, appeals by right from his convictions by a jury of voluntary manslaughter, MCL 750.321, felon in possession of a firearm ("felon in possession"), MCL 750.224f, and two counts of possessing a firearm during the commission of a felony ("felony-firearm"), MCL 750.227b. This matter arises out of the undisputed fact that defendant shot his long-time friend, Ray Pumell, during an altercation instigated by Pumell. Defendant's theory of the case was self-defense. Defendant was sentenced, as a second-offense habitual offender, to concurrent terms of 107 to 270 months' imprisonment for manslaughter and 28 to 90 months' imprisonment for felon in possession, both consecutive to concurrent two-year terms for felony-firearm. Defendant received 724 days of credit applied to his felony-firearm sentences. Defendant was taken into custody on the night of the shooting, and he has remained in custody since that time. Defendant seeks vacation of his convictions and dismissal of his charges, arguing that he was deprived of his right to a speedy trial, improperly incarcerated for the duration of the proceedings, and denied the effective assistance of counsel because trial counsel failed to invoke his right to a speedy trial and seek his pretrial release. We affirm.

## I. FACTUAL BACKGROUND

From the outset, defendant fully conceded that he shot the victim. Defendant's theory of the case was that he acted in self-defense and was guilty of manslaughter at the most, rather than second-degree murder as he was charged. The victim was significantly smaller than defendant. Although they had been very close, like "brothers," they had recently had "some problems." On July 27, 2017, the victim had consumed a beer and a "short bottle of gin," although the victim's

-1-

then-girlfriend opined that the victim was not intoxicated. With the girlfriend as a passenger, the victim unexpectedly and abruptly decided to drive to defendant's house, which the girlfriend found concerning. The victim parked in the street, exited the vehicle, and approached defendant, who was in his yard. The girlfriend heard the victim challenge defendant, asking "did he still wanna fight him, you know, did he still wanna fight." The girlfriend did not hear either the victim or defendant say anything further, but the "next thing" she saw was defendant and the victim fighting. The girlfriend opined that defendant initiated the fight and, notwithstanding the victim's smaller size, the victim appeared to be winning the fight. The fight moved inside a car parked in the driveway, with the victim on top of defendant, and then moved "up against the fence" with the victim "drilling on" defendant. The girlfriend never saw defendant throw a punch and only saw the victim continually striking defendant. She then saw defendant "fumbling in his pocket," heard four gunshots, smelled fire and saw smoke, and saw the victim fall to the ground. She then saw defendant raise his hand, whereupon she fled to her vehicle and drove away, fearful that she "might be next." The girlfriend was the only eyewitness to testify.

Numerous police officers and evidence technicians also testified about what they observed when they responded to the shooting and during the ensuing investigation. One officer saw a holster for a ".38 Special" on the passenger side of one of the vehicles in defendant's driveway. A search warrant was obtained, following which a handgun was recovered from the inside of a cooler found in the same vehicle. An empty box of ammunition and a number of live .38 caliber rounds were found in a bedroom in defendant's house. Another officer encountered defendant in the roadway, and defendant indicated that he was the owner of the residence. Defendant told the officer that he had been celebrating his birthday with some friends, when the victim, who defendant identified as his brother, stumbled out of the vehicle and collapsed on the ground, whereupon defendant called 911. The police initially regarded defendant as a witness and asked "open-ended questions" about what happened; defendant never said anything about having shot the victim or having been afraid of the victim, nor did defendant appear injured. Defendant was eventually taken to the police station, where he was interviewed. A recording of the interview was played for the jury.

Meanwhile, the victim was taken to the hospital by ambulance, where he was pronounced dead the next morning. The medical examiner concluded that the victim had been shot four times, all of which contributed to the victim's death, but the wound to his abdomen was the worst. The victim had a blood alcohol level of .167. Three bullets were recovered from the victim's body, two of which were .38 Special and one of which was .22 caliber. One of the .38 Special bullets was conclusively fired from the handgun found in the cooler, one of the .38 Special bullets was consistent with the handgun, and the .22 must have been fired from a different gun. It was explained that shooting victims were not-uncommonly found to have been shot non-fatally on previous occasions and to still have an old bullet lodged in their body. The handgun was swabbed for DNA, which was compared to a sample taken from defendant, but there were too many DNA contributors on the swab from the gun to make an interpretation.

The jury acquitted defendant of second-degree murder; but he was convicted of voluntary manslaughter, felon-in-possession, and felony-firearm as described above.

## II. PROCEDURAL BACKGROUND

It is not disputed that defendant was taken into custody on the night of the shooting, July 27, 2017, and he has been in custody ever since. Although there is a handwritten notation in the lower court record suggesting that defendant made some kind of appearance on August 2, 2017, that appearance was neither recorded nor docketed, and apparently Genesee County "did away with" formal arraignments. Defendant's bond was set at $50,000 cash/surety for his weapons charges, but he was denied bond for his second-degree murder charge. Thereafter, the proceedings were beset by numerous delays due to a combination of unavailable witnesses and tardy laboratory reports, plea negotiations, the retirement and replacement of the original presiding judge, the realization that some forensic evidence had not been analyzed, a phone call defendant placed from jail that the attorneys believed might be incriminating, and scheduling conflicts for the court and for the attorneys. Defendant's trial commenced on June 12, 2019, by which time defendant had been in custody for a little more than 22 months. Although many discussions occurred off the record, it appears that defendant's trial counsel generally acquiesced in the delays due to outstanding laboratory and forensic reports in the interest of having a "complete file."

After defendant filed his appeal, this Court granted his motion to remand for an evidentiary hearing. Defendant generally contended that his trial counsel had been ineffective for failing to insist upon defendant's right to a speedy trial, for failing to seek a release on personal recognizance pursuant to MCR 6.004, and for failing to ensure that defendant's arguments on those issues were preserved for appeal. He therefore "request[ed] that this Court remand his case to the trial court for a full evidentiary hearing into his allegations of ineffective assistance of counsel." This Court granted the motion "so that defendant may bring a motion for appropriate relief and have an evidentiary hearing as to the claim of ineffective assistance of counsel raised in the motion for remand," but noting that the proceedings would be "limited to the issues raised in the motion for remand."

At the hearing, defendant's trial counsel testified that he had been in the practice of law for more than 40 years, mostly in Genesee County, he was familiar with the right to a speedy trial, he did not believe defendant waived that right, and he agreed that defendant had been in custody since July 27, 2017. Counsel opined that it was unusual for cases to take 23 months to reach trial, but it was "not unusual to run into issues of discovery" despite believing that evidence ought to have been ready. Counsel believed he would have been laughed at for invoking defendant's right to a speedy trial, so he acquiesced in the adjournments to obtain the outstanding evidence. He did not bring any other discovery motions because he "would have been complaining about the prosecutor's office and that isn't where the problem was."

Counsel stated that he discussed everything with defendant, and he was surprised by defendant's contention that he was not present for some hearings. Counsel further stated that he believed the transcripts stating that defendant was absent must be incorrect "knowing the judge involved," with the exception of "two video ones." He also waived defendant's presence for one hearing at which he expected only to be given a trial date. Counsel agreed that defendant was not happy about the situation, but contended that defendant understood the need for the adjournments, and that they discussed and agreed to the decision to obtain a complete file instead of insisting upon a speedy trial. Counsel also stated that defendant voiced questions and they had discussions. Trial counsel further noted that he discussed extensively with defendant the fact that the best-case

-3-

scenario was only an acquittal of the murder charge, which meant he would have to admit to the felon-in-possession charge. Consequently, counsel explained to defendant that he was going to be sentenced no matter what, and the time he spent in jail was "all good time" because it would be credited against his inevitable felony-firearm sentence. Counsel stated that he visited defendant 41 times, and although defendant was unhappy about the situation, defendant never expressed unhappiness with counsel.

Counsel stated that they "were in [plea] negotiation right up to June 6th, the trial, when the trial started" and that he had been trying to solicit a plea offer "back in district court." Counsel only obtained a plea offer from the prosecutor by "going above her head," and although the prosecution offered manslaughter, the prosecution also specified a mandatory twelve-year minimum sentence. Counsel stated that defendant was interested in a plea offer, but he refused to entertain the mandatory minimum sentence. Based on his familiarity with the judges and prosecutors in Genesee County, and his meetings with the prosecution, counsel believed the prosecution would not budge on the plea offer under any circumstances. At defendant's request, counsel nevertheless continued attempting to negotiate a better plea agreement.

Counsel agreed that he could have invoked the right to a speedy trial and used the absence of forensic evidence against the prosecution; but he believed doing so would have been ineffective because some of the evidence might have been beneficial, and he could not "just presume things are going to be good or bad." He emphasized that his policy for all of his cases was that "if it's there to be had, I want it before I go to trial . . . It's just that simple." He emphasized that he would prefer to err against a speedy trial in order to ensure that he had all the evidence so his clients would receive a proper trial. Counsel recognized that his decision not to insist upon a speedy trial "was likely to get me where I'm sitting right now" because he had to make a choice between two conflicting obligations: either a speedy trial or obtaining a complete file, and he would have also ended up at the wrong end of an ineffective assistance claim had he gone to trial and missed a piece of evidence that would have been helpful.

Counsel stated that he discussed the possibility of filing a motion for release on personal recognizance with defendant, but in his experience with that court, "you can file motions until hell freezes over on a murder case for a PR bond and you're not getting it under the statute or under the court rule." He further explained that a personal recognizance bond on a homicide charge was generally unlikely, but "even more so specific to the court we were in." He also noted that even if the personal recognizance bond was granted, trial might be scheduled immediately, and he would not feel prepared because of the outstanding discovery. He explained that his reasoning for not insisting on a speedy trial was similar, and even if it put pressure on the prosecutor, he did not believe it would change the prosecutor's mind. Counsel agreed that in some cases, a defendant would have a stronger bargaining position when out of custody, but "on a murder charge, I don't think it made any difference at all."

Counsel agreed that the defense was always self-defense, and the evidence important to the defense was the eyewitness testimony and what defendant had told him. Counsel agreed that neither the firearms report nor the autopsy report were ultimately helpful to the self-defense argument. Nevertheless, counsel opined that "to do a proper trial" he needed to have anything the prosecutor intended to use as evidence, so he stipulated to the adjournments so the evidence could be obtained. Counsel admitted that much of the evidence proved useless, but he stated that he

would not have any way to know that it was not potentially exonerating until the results were back. When counsel received the evidence of the phone call, he was initially concerned that it might be harmful for impeachment purposes; the call turned out to be harmless, but it nevertheless took some time to listen to it and discuss it with defendant. Counsel also noted that when the original judge retired, the successor judge "got everybody's unwanted files when she got on the bench," which resulted in several more adjournments.

Defendant testified that he was in his early fifties at the time of the shooting, he had no legal training, and he had never previously been in jail. Defendant denied that counsel visited him "even close" to 41 times, although when reminded that jails keep track of visits, he backtracked and stated that counsel "would come see me for him to get paid, I guess for me to sign a paper like every two weeks." Defendant insisted that counsel never actually talked to him, particularly about the prospect of having a right to a speedy trial or waiving that right. Defendant found the situation unpleasant. Defendant trusted counsel at first, but eventually asked how he could get another lawyer, only for counsel to tell him "it was too late.". Defendant stated that he knew he was charged with second-degree murder, but he did not recall being informed about what kind of sentence or penalty was associated with the charge. He did not recall receiving a felony information, other than later receiving a paper that only stated "habitual on it," which defendant found confusing. Defendant denied going over his PSIR with his attorney, but rather with a probation officer. Nevertheless, he did go over it, and he agreed that it accurately stated that he had two years of college. Defendant gave a confusing answer when asked whether he agreed that he was found not guilty of second-degree murder, but eventually he agreed. Defendant recalled participating in hearings by video four or five times and personally attended "probably about four" hearings in person.

At the conclusion of the hearing, the trial court ruled from the bench that trial counsel had not been ineffective. The trial court agreed with counsel's assessment that a balancing act was needed between invoking a speedy trial and risking missing helpful evidence. The trial court noted that the originally assigned judge had a reputation for "the rocket docket," so if a speedy trial motion had been granted, trial would likely have been set for the very next day. The trial court observed, "be careful what you wish for," and concluded that it was not unreasonable for trial counsel to have decided to wait for a complete file. The trial court observed that the Genesee County courts were understaffed, a trial was ultimately held, and it was not persuaded that the outcome of the trial would have been different. The matter then returned to this Court.

III. RIGHT TO A SPEEDY TRIAL

Defendant first argues that he was deprived of his right to a speedy trial. We disagree.

Whether a defendant has been deprived of his or her right to a speedy trial is a question of constitutional law. *People v Cain*, 238 Mich App 95, 111; 605 NW2d 28 (1999). Ordinarily, it is therefore reviewed de novo. *People v Hickman*, 470 Mich 602, 605; 684 NW2d 267 (2004). However, defendant did not preserve this right by raising it in the trial court. See *Cain*, 238 Mich App at 111. Unpreserved constitutional errors are reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 764-765; 597 NW2d 130 (1999). Under that standard, defendant must show that "clear or obvious" error occurred and that the error either affected the outcome of the proceedings or seriously undermined the integrity of the proceedings. *Id*. at 763-

764. Whether a defendant's right to a speedy trial has been violated turns on a "four-part balancing test articulated in *Barker v Wingo*, 407 US 514; 92 S Ct 2182; 33 L Ed 2d 101 (1972)," under which the courts must "consider (1) the length of the delay, (2) the reasons for the delay, (3) the defendant's assertion of the right, and (4) prejudice to the defendant." *Cain*, 238 Mich App at 112 (quotation omitted).

## A. LENGTH OF THE DELAY

A delay of more than 18 months "is presumed prejudicial and places a burden on the prosecutor to rebut that presumption." *Cain*, 238 Mich App at 112. Furthermore, the length of a delay must be considered in light of the circumstances of the case and the seriousness of the crime. *People v Collins*, 388 Mich 680, 688-690; 202 NW2d 769 (1972). The length of the delay, by itself, will not require reversal. *People v Simpson*, 207 Mich App 560, 564; 526 NW2d 33 (1994). Rather, a delay in excess of the 18-month period "triggers an inquiry into the other factors to be considered in the balancing of the competing interests to determine whether a defendant has been deprived of the right to a speedy trial." *People v Wickham*, 200 Mich App 106, 109; 503 NW2d 701 (1993). The presumptive prejudice from a lengthy delay cannot, standing alone, establish a deprivation of the right to a speedy trial, although the longer the delay, the more serious its concern. *Doggett v United States*, 505 US 647, 655-656; 112 S Ct 2686; 120 L Ed 2d 520 (1992). There is no dispute that the delay in this matter of almost 23 months triggers consideration of the other factors. Nevertheless, in *Cain*, a delay of 27 months was held not dispositive by itself. *Cain*, 238 Mich App at 112-113.

## B. REASONS FOR THE DELAY

The United States Supreme Court explained that "different weights should be assigned to different reasons." *Barker*, 407 US at 531. Deliberate delaying tactics by the prosecution would weigh heavily against the prosecution, *id.*, but, as defendant expressly concedes, there is no indication here of any such tactics. Conversely, missing witnesses or an unexpected illness of an officer in charge are examples of valid reasons that can justify delays. *Id.* at 531, 533-534. Reasons "such as negligence or overcrowded courts should be weighed less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Id.* Some delays may also be attributable to a defendant; for example, where a defendant requests an adjournment or where time is expended adjudicating defense motions, *Cain*, 238 Mich App at 113; or where the defense delays trial as a tactical gambit, *Barker*, 407 US at 534-536. Defendant contends that all but perhaps one of the delays in this matter were for "neutral" reasons but nonetheless attributable to the prosecution. We disagree.

The hearing transcripts indicate that many of the delays were attributable to the various forensic testing facilities rather than to the prosecutor. Nevertheless, defendant correctly states that those delays were not attributable to him, and although of "neutral" character, should be attributed to the government. However, defense counsel stipulated to one adjournment based on a longstanding, previously-established personal conflict by the prosecutor. The possibility of a plea agreement was discussed at numerous hearings, and on several occasions defense counsel explicitly requested or agreed to adjournments for the purpose of conducting plea negotiations. As defendant concedes, there was one delay seemingly due to defense counsel's conflict. Some kind

of delay occurred due to newly-created evidence of a phone call placed by defendant, even though that evidence ultimately proved irrelevant. Defense counsel also agreed that an overlooked bullet should be tested, which would take some additional time. Finally, counsel's strategy was to ensure a complete record so that no potentially exonerating evidence was missed. Irrespective of whether that was a sound strategy, it is clear that many of the adjournments were either attributable to defendant or, minimally, expressly agreed to by defendant. Acquiescence by a defendant will extenuate delays caused by the government. *Doggett*, 505 US at 658. On balance, the reasons for the various delays do not clearly favor either the defense or the prosecution.

## C. ASSERTION OF THE RIGHT

There is no dispute that defendant did not assert his right to a speedy trial. Although this does not forfeit the right, and defendant argues that it was an unsound trial strategy, his failure to assert the right nevertheless weighs against him. *Collins*, 388 Mich at 693-694.

## D. PREJUDICE TO DEFENDANT

"There are two types of prejudice which a defendant may experience, that is, prejudice to his person and prejudice to his defense." *Collins*, 388 Mich at 694. The latter is because one of the purposes of the right to a speedy trial is to "ensure[] that a guilty verdict results only from a valid foundation in fact." *Cain*, 238 Mich App at 111. Many of the delays in this matter were for the purposes of adducing all of the evidence. Defendant points out that it is difficult to see how, given the nature of the theory of the defense, any additional evidence could possibly have been expected to help. Nevertheless, none of the additional evidence harmed the defense: it merely established facts that were not actually in dispute. There was no deterioration of exonerating evidence in the meantime, and the only helpful evidence—the testimony from the sole eyewitness—was not lost. Although there was briefly an apparent risk that damaging impeachment evidence was uncovered, that evidence turned out to be irrelevant. Defendant continued to expect to testify until the very last moment, before apparently having personal second thoughts. Because there was no evidence defendant could have apparently personally helped uncover, it is highly unlikely that his ability to help prepare the case was hindered. See *Collins*, 388 Mich at 694. There is no hint in this record that the delay hindered defendant's defense in any way. *Cain*, 238 Mich App at 114.

However, prejudice also includes "oppressive pretrial incarceration" and "anxiety and concern of the accused." *Barker*, 407 US at 532. Regarding the former, defendant did receive credit for the entire time he spent in custody. As trial counsel testified at the evidentiary hearing, defendant's best-case scenario would still have involved being convicted of a felony, and it was extremely unlikely he would have been released on any kind of bond. In other words, there was really no possibility defendant would not have spent that time in custody under any circumstances. It does not appear that defendant was subjected to public scorn, deprivation of employment, or an inability to participate in political causes. See *Barker*, 407 US at 532 n 33. We therefore conclude that defendant's pretrial incarceration would not qualify as "oppressive."

Defendant testified that he found the experience of sitting in jail and waiting unpleasant and traumatic. As a matter of everyday experience, uncertainty alone is stressful. Furthermore, the United States Supreme Court has recognized that jails are often more unpleasant than prisons,

being relatively lacking in "recreational or rehabilitative programs," so "time spent in jail is simply dead time." *Barker*, 407 US at 532-533. We therefore believe that prejudice in the form of "anxiety and concern of the accused" has been established.

## E. BALANCING AND CONCLUSION

The delay of almost 23 months triggers the requirement to consider whether the delay in bringing defendant to trial caused him prejudice. Defendant suffered some prejudice to his person, which weighs in favor of a finding that his right to a speedy trial was violated. However, he suffered no prejudice to his actual defense, nor did he spend any time in custody that would not have inevitably been spent there, under even the most optimistic scenario. Many of the delays were attributable to the government, although they were largely neutral in character, but many of the delays were agreed to by defense counsel for strategic reasons or otherwise attributable to the defense. The absence of an assertion of the right to a speedy trial weighs against a finding that defendant was prejudiced. Ultimately, we conclude that given the seriousness of the charges, the neutral character of the delays and their acquiescence by defense counsel, the fact that defendant did not suffer any excess incarceration, and the total absence of any prejudice to the defense, the balance favors a finding that defendant was not deprived of his right to a speedy trial.

## IV. EFFECTIVE ASSISTANCE OF COUNSEL

Defendant also argues that he was deprived of the effective assistance of counsel because trial counsel had no sound strategic reason for acquiescing in the numerous delays, and trial counsel should have sought defendant's release on his own recognizance pursuant to MCR 6.004(C). We disagree.

Defendant preserved his claim of ineffective assistance of counsel by moving in this Court for a remand for an evidentiary hearing. See *People v Moore*, 493 Mich 933, 933; 825 NW2d 580 (2013). "Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). A trial court's findings of fact are reviewed for clear error and questions of law are reviewed de novo. *Id*. "To find that a defendant's right to effective assistance of counsel was so undermined that it justifies reversal of an otherwise valid conviction, a defendant must show that counsel's performance fell below an objective standard of reasonableness, and that the representation so prejudiced the defendant as to deprive him of a fair trial." *People v Pickens*, 446 Mich 298, 338; 521 NW2d 797 (1994), adopting the standard from *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). The appropriate test for prejudice is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 US at 694. "Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Eisen*, 296 Mich App 326, 329; 820 NW2d 229 (2012) (citation and quotation marks omitted). "Defendant must overcome the strong presumption that counsel's performance was sound trial strategy." *People v Dixon*, 263 Mich App 393, 396; 688 NW2d 308 (2004). "[T]rial counsel cannot be faulted for failing to raise an objection or motion that would have been futile." *People v Fike*, 228 Mich App 178, 182; 577 NW2d 903 (1998).

## A. PERSONAL RECOGNIZANCE BOND

Pursuant to MCR 6.004(C), in relevant part:

> In a felony case in which the defendant has been incarcerated for a period of 180 days or more to answer for the same crime or a crime based on the same conduct or arising from the same criminal episode . . . the defendant must be released on personal recognizance, unless the court finds by clear and convincing evidence that the defendant is likely either to fail to appear for future proceedings or to present a danger to any other person or the community.

The rule goes on to specify certain events to exclude from computing the 180-day period, but we presume the rule became effective to defendant on January 23, 2018. Nevertheless, trial counsel explained at the evidentiary hearing that because defendant was charged with a homicide offense, it was highly unlikely that a personal recognizance bond would be granted, and it was even more unlikely in that particular court. We agree. Defendant was denied bond entirely for the homicide charge from the outset. It is simply not plausible that any such release on defendant's personal recognizance would have been granted, given both the homicide charge and the felon-in-possession charge. Trial counsel was not ineffective for failing to seek a release on defendant's personal recognizance pursuant to MCR 6.004(C), because doing so would have been obviously futile. *Fike*, 228 Mich App at 182. At a minimum, trial counsel's decision not to pursue such a motion cannot be below an objective standard of reasonableness because it was reasonable to believe that it would never be granted.

## B. INVOCATION OF RIGHT TO SPEEDY TRIAL

Whether counsel was ineffective for failing to invoke defendant's right to a speedy trial is a closer question. Counsel's reasoning was that he knew he had to choose between either (1) invoking the right to a speedy trial, or (2) taking a risk that he was missing a piece of exonerating evidence. In general, erring on the side of completeness does not seem unsound. Defendant makes a reasonable argument that no facts were disputed, the defense was always self-defense, and the defense turned almost entirely on the testimony of a single eyewitness; therefore, nothing helpful to the defense could possibly have ever been outstanding. However, counsel's decisions must not be evaluated with the benefit of hindsight, and counsel is obligated to conduct a reasonably complete investigation. *People v Grant*, 470 Mich 477, 485; 684 NW2d 686 (2004).

Importantly, each time defense counsel acquiesced to any given adjournment, it would have been impossible to predict that more delays would occur. In contrast, counsel did know that defendant would be incarcerated for that time even under the best-case scenario. Without the benefit of hindsight, the trial court's observation of "be careful what you wish for" does not seem clearly erroneous. Even if it later turned out that none of the outstanding evidence was helpful, defendant was not going anywhere, so it was not unreasonable to ensure that the evidence was complete. Furthermore, some of the delays were because defendant and the prosecution were continuing to negotiate a plea agreement, which counsel opined would not have been benefitted by insisting on the right to a speedy trial. Rather, as the trial judge observed, trial would have simply been scheduled for the next day, ready or not—and counsel believed he was not.

Defendant presents a difficult to understand argument that the trial court should not have considered whether defendant was prejudiced under *Strickland*, but rather whether defendant was prejudiced under *Doggett*. As noted, under *Strickland*, one of the prongs for establishing ineffective assistance of counsel is showing a reasonable probability that the outcome of the proceedings would have differed. *Strickland*, 466 US at 694. Defendant points out that in *Doggett*, the United States Supreme Court indicated that sufficiently egregious delays caused by government negligence may, alone, establish a deprivation of the right to a speedy trial, unless "extenuated" or "persuasively rebutted." *Doggett*, 505 US at 657-658. However, we have already determined that defendant was not deprived of his right to a speedy trial. The analysis in *Doggett* would be relevant to that question, and notably, the delay in that case was six years of totally unexcused negligence by the government. *Id*. In contrast, *Strickland* sets forth the appropriate standard for determining whether a defendant was deprived of the right to effective assistance of counsel.

At the remand hearing, it appeared to have been tacitly agreed that *if* trial counsel had brought a speedy trial motion, the motion would have been granted. However, doing so would have gained no tactical or other practical advantage for the defense, and doing so would not have hampered the prosecution or induced the prosecution to extend a better plea offer. The only arguable benefit would have been defendant spending a different proportion of his time in prison instead of in jail. If counsel invoked the right to a speedy trial before discovery was complete, defendant would have risked the possibility of missing exonerating evidence. Invoking the right to a speedy trial during plea negotiations would have simply terminated those negotiations. By the time the eighteen-month "presumptive prejudice" period ran, there were serious scheduling conflicts due to the replacement of the trial judge and an upcoming complex case. Shortly thereafter the final trial date—on which trial was actually commenced—was set. Therefore, we do not think defendant has established that invoking the right to a speedy trial would have achieved anything. In any event, defendant has not overcome the burden of proving counsel's strategy to have been objectively unreasonable under the circumstances.

Affirmed.

/s/ Kathleen Jansen
/s/ Michael J. Kelly
/s/ Amy Ronayne Krause